1  TIMOTHY COURCHAINE
   Acting United States Attorney
2  District of Arizona

3  MATTHEW WILLIAMS
   Assistant United States Attorney
4  Arizona State Bar No. 029059
   Two Renaissance Square
5  40 N. Central Ave., Suite 1800
   Phoenix, Arizona 85004
6  Telephone: 602-514-7500
   Email: Matthew.Williams3@usdoj.gov
7
   LORINDA LARYEA
8  Acting Chief, Fraud Section
   United States Department of Justice
9
   SHANE BUTLAND
10 WILLIAM HOCHUL III
   Trial Attorneys
11 Criminal Division, Fraud Section
   U.S. Department of Justice
12 1400 New York Avenue NW
   Washington, D.C. 20005
13 Telephone: 202-286-1177
   Email: shane.butland2@usdoj.gov
14
   Attorneys for Plaintiff
15

16              IN THE UNITED STATES DISTRICT COURT

17                 FOR THE DISTRICT OF ARIZONA

18
19   United States of America,                No. CR-25-00915-PHX-SMB

20                       Plaintiff,
                                              **UNITED STATES' RESPONSE TO
21          vs.                               DEFENDANT'S MOTION TO VACATE,
                                              OR IN THE ALTERNATIVE, TO
22   Joel Max Kupetz,                         MODIFY SEIZURE WARRANTS**
          a/k/a Max Kupetz,
23
24                       Defendant.
25

26        The United States, by and through undersigned counsel, submits this memorandum

27 in opposition to Defendant Joel Max Kupetz's ("defendant"), motion to vacate, or

28 alternatively, to modify the seizure warrants issued in the above-captioned matter. [ECF
   No. 54].

The defendant's motion should be denied. Contrary to the defendant's assertions, a review of the warrant Affidavit establishes that there was probable cause to issue the warrants, the seized funds were adequately traced and specifically identified, facts were sufficiently alleged to justify immediate seizure under 853(f) instead of a protective order under 853(e), and the approximately $6.6 million seized from the defendant's accounts (the "**Target Accounts**") did not exceed the Defendant's personal gain from any alleged wrongdoing, potential fines, or guidelines-level forfeiture; indeed, the warrant Affidavit and indictment allege that the Defendant and his co-conspirators are responsible for an intended loss to Medicare and other federal and commercial health insurers exceeding $1 billion, an actual loss exceeding $600 million, and that the defendant personally received over $8.2 million in illegal kickbacks. *See* Aff. ¶5. Additionally, the warrant Affidavit set forth probable cause to seize any "untainted" funds commingled with the fraud proceeds, as those funds were "involved in" transactional money laundering.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On June 17, 2025, the government submitted several seizure warrants to U.S. Magistrate Judge Eileen S. Willett for review. Three of the warrants sought the seizure, pursuant to 21 U.S.C. 853(f), of the contents of U.S. Bank account ending in 6205 (**Target Account 1**), Charles Schwab account ending in 1792 (**Target Account 2**), and Coinbase account ending in b807 (**Target Account 3**) (collectively, the **Target Accounts**), all of which belonged to and were controlled by the defendant. *See* Case Nos. 25-9258MB, 25-9259MB, and 25-9261MB. Special Agent James Ingram of the Department of Veterans Affairs was the affiant on the Affidavit supporting those warrants. *Id*. Magistrate Judge Willett signed the warrants the same day they were submitted. *Id*.

Upon execution of the warrants, the government seized a total of $6,652,040.03: $27,829.17 from **Target Account 1**, $3,702,644.93 from **Target Account 2**, and $2,921,565.93 from **Target Account 3**.

On June 18, 2025, a grand jury in the District of Arizona returned an indictment against the defendant and co-defendants Tyler Kontos and Jorge Kinds that charged them

with conspiracy to commit health care fraud (18 U.S.C. § 1349), health care fraud (18 U.S.C. §§ 1347 and 2), conspiracy to defraud the United States (18 U.S.C. § 371), receiving health care kickbacks (42 U.S.C. §§ 1320a-7(b)(1) and 2), and transactional money laundering (18 U.S.C. §§ 1957 and 2 – the defendant and Kontos only). [ECF No. 1]. The indictment includes forfeiture allegations pursuant to 18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461(c). *Id*. at 17-18.

The warrant Affidavit and indictment allege the defendant's involvement in a massive health care fraud and kickback conspiracy that resulted in over $1 billion of false and fraudulent claims to be submitted to Medicare between November 2022 and May 2024 for medically unnecessary amniotic wound allografts that were applied to elderly Medicare beneficiaries, some of whom were terminally ill and in hospice care. Aff. ¶¶5-6, 14; ECF No. 1 at 2. Medicare and other health benefit programs paid over $614 million based on those false and fraudulent claims, and the defendant personally received over $8 million in illegal kickbacks for his role. *Id*. ¶¶6, 14; ECF No. 1 at 11.

The warrant Affidavit alleges that the defendant was a sales representative for a company called Apex Medical LLC ("Apex") and its successor, Viking Medical Consultants LLC ("Viking"), both of which were run by Alexandra Gehrke.[1] Aff. ¶20. The defendant was one of several medically untrained sales representatives who were responsible for locating elderly Medicare beneficiaries who had wounds at any stage and order allografts from the allograft distributor to be placed on those wounds. Aff. ¶9. Gehrke then referred the patients to Apex Mobile Medical LLC ("Apex Mobile") and its successor, APX Mobile Medical LLC ("APX"), co-owned by Jeffrey King,[2] which contracted with

---

[1] Gehrke was indicted on June 17, 2024, for her role in this conspiracy. Case No. 24-CR-01040. Gehrke pleaded guilty to conspiracy to commit health care fraud and wire fraud on October 24, 2024, and was sentenced to 186 months' imprisonment on October 10, 2025. [ECF Nos. 116, 180].

[2] King was indicted with Gehrke on June 17, 2024, for his role in this conspiracy. Case No. 24-CR-01040. King pleaded guilty to conspiracy to commit health care fraud and wire fraud on January 31, 2025, and was sentenced to 168 months' imprisonment on October 14, 2025. [ECF Nos. 138, 188].

nurse practitioners to apply the allografts. Aff. ¶10. Apex Mobile and APX fraudulently billed Medicare and other federal health care programs and commercial insurers for the allografts. Aff. ¶11.

Gehrke instructed and financially incentivized the sales representatives, including the defendant, to order allografts in sizes 4x6 centimeters or larger, even if the wound was much smaller, to maximize insurance reimbursement. Aff. ¶12. Gehrke received over $279 million in illegal kickbacks from the allograft distributor in exchange for the orders. Aff. ¶13. Gehrke in turn paid sales representatives tens of millions of dollars. Aff. ¶13.

The defendant worked as a sales representative for Apex from in and around May 2023, through in and around March 2024. Aff. ¶20. His role was to identify Medicare beneficiaries with wounds of any size or severity; order and recommend the ordering of allografts to be placed on the wounds; and refer the beneficiaries to APX to receive allografts. Aff. ¶20. He brought the allografts directly to the patients and pressured APX nurse practitioners to apply the allografts without exercising medical judgment in sizes and quantities that often exceeded the size of the wound. Aff. ¶21.

## II.    **LEGAL STANDARDS**

Title 21 U.S.C. § 853[3] provides that a person convicted of certain specified offenses "shall forfeit . . . any property" that was derived from the commission of those offenses. *United States v. Monsanto*, 491 U.S. 600, 607 (1989). Criminal forfeiture is also available for all property forfeitable under the civil forfeiture statute (18 U.S.C. § 981) through 28 U.S.C. § 2461(c). Section 2461(c) directs courts to order criminal forfeiture whenever civil or criminal forfeiture is authorized by statute, appropriate notice is given in the indictment, and the defendant is found guilty of the qualifying offense, including money laundering (*see* 18 U.S.C. § 981(a)(1)(A)) and health care fraud (*see* 18 U.S.C. § 981(a)(1)(C)).

The government has the authority to restrain certain assets of a criminal defendant

---

[3] Section 853 applies in criminal forfeiture proceedings, including seizures of property for forfeiture, by action of 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2561(c) (providing that the procedures in 21 U.S.C. § 853 "apply to all stages of a criminal forfeiture proceeding.").

prior to trial based on a showing of probable cause that the property will ultimately be proved forfeitable. *Id.* at 615 (citing *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 633 (1974)). Probable cause to restrain assets subject to forfeiture "is not a high bar," *Kaley v. United States*, 571 U.S. 320, 338 (2014), and is "less than *prima facie* proof but more than mere suspicion." *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1169 (9th Cir. 2008). The government must demonstrate "that the property is involved in the activity subject to the specific forfeiture statute it invokes," *id.*, and establish a nexus between the property and the offense. Fed. R. Crim. P. 32.2(b).

The extent to which the government can forfeit property depends on the forfeiture statute that corresponds to the offense of conviction. *See* 18 U.S.C. § 982. For some offenses, such as health care fraud, the forfeiture statute requires the court to order forfeiture of property constituting, or derived from, "proceeds" traceable to the commission of the offense. *See* 18 U.S.C. § 982(a)(7). For other offenses, such as money laundering under 18 U.S.C. § 1957, the statute requires the court to order forfeiture of any property "involved in" such offense, not simply the "proceeds" of the offense.[4] *See* U.S.C. § 982(a)(1).

Under 18 U.S.C. § 1957, if criminal proceeds are commingled with untainted assets, the untainted assets are subject to forfeiture as "involved in" the money laundering offense. *See United States v. Real Property*, Case No. 5:08-cv-303, 2008 WL 11470836, at *6 (M.D. Fla. Dec. 29, 2008) (holding that "under section 1957 the United States is entitled to seek forfeiture of all funds in an account, even if clean funds are involved"); *United States v. Mille*r, 295 F. Supp. 3d 690, 697-698 (E.D. Va. 2018); *United States v. Lindell*, No. 13-00512 DKW, 2016 WL 4707976, at *5 (D. Haw. Sept. 8, 2016).

Under Section 853's criminal forfeiture provisions, the government may seek pretrial custody of criminally forfeitable property to prevent its dissipation. The mechanism to do so is either a protective order under Section 853(e) or a seizure warrant under Section

---

[4] The indictment gave notice to the defendant that the government will seek forfeiture under both a "proceeds" and money laundering ("involved in") theory. *See* ECF No. 1 at 17.

853(f).

Under Section 853(e)(1), "the court may enter a restraining order or injunction, require the execution of a satisfactory performance bond, or take any other action to preserve the availability of [forfeitable property] for forfeiture" upon application by the government. 21 U.S.C. § 853(e)(1). Under Section 853(f), if the court "determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture," and that a restraining order, injunction, or temporary restraining order under subsection (e) "may not be sufficient to assure the availability of the property for forfeiture," the court "shall issue a warrant authorizing the seizure of such property." 21 U.S.C. § 853(f).

A magistrate judge's "determination of probable cause should be paid great deference by reviewing courts." *United States v. King*, 985 F.3d 702, 707 (9th Cir. 2021) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). A court must not "invalidate the warrant by interpreting the affidavit in hypertechnical, rather than a commonsense, manner." *Id*. (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)). Rather, the reviewing court's "duty is limited to ensuring that the magistrate had a 'substantial basis' for concluding that probable cause existed." *Id*. (quoting *Gates*, 462 U.S. at 238).

## III.    **ARGUMENT**

The defendant asks the Court to vacate the seizure warrants executed on the defendant's financial accounts in their entirety, or alternatively, to modify the warrants to "release all untainted assets" and convert the warrants to "temporary protective orders under § 853(e)." [ECF No. 54 at 1]. According to the defendant, such relief is warranted because: (1) the seizure warrants lacked probable cause as to each account and failed to delineate which portions of the seized account balances were traceable to criminal conduct; (2) the seizure warrants lacked any particularized explanation as to why restraining orders were insufficient to preserve the property for forfeiture; (3) the seizures of "untainted assets" (along with criminal proceeds) without specific justification violated the Fourth Amendment; (4) the lack of pre-seizure notice or hearing deprived the defendant of his

Fifth Amendment right to contest the basis for forfeiture and affected his Sixth Amendment right to counsel of choice; and (5) the seizure of defendant's property violated the Excessive Fines clause of the Eighth Amendment, as the "value seized is grossly disproportionate to the legitimate penalties or forfeitable proceeds in this matter." *Id*. at 2-17.

Preliminarily, to the extent the defendant seeks return of seized property for any reason other to pay counsel of choice, the defendant is effectively moving for return of property under Fed. R. Crim. P. 41(g). This Rule 41(g) motion should be denied, as the defendant's remedy is to contest the forfeiture at the conclusion of the criminal proceeding.

Should the Court consider the defendant's motion, the relief sought should be denied for the following reasons:

- The warrant Affidavit establishes that the warrants (i) were supported by probable cause as to each account; (ii) specifically identified the amounts directly traceable to fraudulent proceeds; and (iii) set forth the required factual basis to demonstrate that other means of restraint may not have been sufficient to preserve the seized funds for forfeiture;

- The seizures were not overbroad in violation of the Fourth Amendment, as each of the **Target Accounts** was substantially, if not entirely, funded with criminal proceeds, and any "untainted funds" were appropriately seized as funds "involved in" the defendant's money laundering offenses;

- The defendant was not deprived of his due process rights under the Fifth Amendment, as there is no legal authority for pre-seizure notice when the property at issue is personal property, nor a Fifth Amendment due process right to a post-seizure, pre-trial hearing on forfeitability of personal property outside of a qualified threshold showing of need to secure counsel of choice;

- The defendant has not shown that the seizures deprived him of his Sixth Amendment right to counsel of choice. The defendant has no legal right to use criminal proceeds to pay for counsel, and to the extent that the defendant seeks

return of any "untainted funds" for that purpose, the defendant has not satisfied his burden of establishing financial need; and

- The defendant's Eighth Amendment challenge at this stage of the proceedings is not only premature, as the defendant has not yet been sentenced let alone tried for the charged offenses, but also factually inaccurate: as noted above, if convicted, the defendant will be required to forfeit the amount of illegal kickbacks he received for his role in the conspiracy, which, at approximately $8 million, exceeds the total seizures at issue by over $1.5 million. Further, the court has authority to impose a fine of twice the pecuniary loss resulting from the offense, which would be over $1.2 billion. *See* 18 U.S.C. § 3571(d).

### 1.  The Defendant's Rule 41(g) Motion Should Be Denied.

Despite acknowledging that at least a portion of the seized funds were lawfully seized and forfeitable, the defendant nevertheless seeks the immediate return of all seized property, or alternatively, reducing the funds retained to those that can specifically be traced to criminal conduct. [ECF No. 54 at 1, 4]. To the extent that the defendant argues the return of seized property for any reason other than to retain counsel of choice, the defendant is effectively moving for the return of property under Fed. R. Crim. P. 41(g) (though he did not affirmatively seek relief on this basis).

Rule 41(g) states that "A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g). The Ninth Circuit has recognized, however, that a defendant is not entitled to return of property if the property is subject to forfeiture. *United States v. Van Cauwenberghe*, 934 F.2d 1048, 1061 (9th Cir. 1991) ("A defendant's [Rule 41(g)] motion for return of property . . . may be denied if . . . the property is contraband or subject to forfeiture . . .").

This accords with the well-established rule that a Rule 41(g) motion is an equitable remedy at law that is available only when there is no adequate remedy at law. *Almeida v. United States*, 459 F.3d 377, 382 (2d Cir. 2006); *See also Khudainatov v. United States*,

No. 3:23-cv-01946-W-SBC, 2023 WL 7501393, at *6-8 (S.D. Cal. Nov. 13, 2023). Federal courts uniformly hold that a pending administrative, civil, or criminal forfeiture proceeding affords an adequate remedy at law and thereby justifies dismissal of a Rule 41(g) motion. *See*, *e.g.*, *States v. Sims*, 376 F.3d 705, 708 (7th Cir. 2004) ("The proper office of a Rule 41(g) motion is, before any forfeiture proceedings have been initiated, or before any criminal charges have been filed, to seek the return of property seized without probable cause."); *Brown v. United States*, 692 F.3d 550, 552 (6th Cir. 2012) (holding the defendant's 41(g) motion fails because the defendant has an adequate remedy at law); *Almeida*, 459 F.3d at 382 (citing opinions from various circuits); *Khudainatov*, 2023 WL 7501393, at *6-8 (holding the court lacked jurisdiction to hear petitioners' Rule 41(g) motion seeking return of a luxury yacht where the government commenced civil forfeiture proceedings, providing petitioners with adequate remedy at law); *United States v. Tahir*, No. 15-20351, 2016 U.S. Dist. LEXIS 19479, at *16 (E.D. Mich. Feb. 18, 2016) ("[W]hen there is either a civil or criminal forfeiture procedure under way, a Rule 41(g) motion is not appropriate.").

The defendant's assertion that the government has not "commenced any judicial forfeiture proceedings where Mr. Kupetz could contest the forfeitability of these assets" [ECF No. 54 at 5] is patently false. The government initiated judicial forfeiture proceedings by securing an indictment against the defendant that included forfeiture allegations [ECF No. 1] and by filing a bill of particulars specifically identifying the **Target Accounts** as subject to forfeiture [ECF No. 40], all in accordance with Rule 32.2(a). Thus, whether the **Target Accounts** are forfeitable is appropriately determined in a post-trial or post-plea forfeiture proceeding where the Court determines "whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A).

As such, because the defendant is afforded an adequate remedy at law by contesting forfeiture at the conclusion of the criminal proceedings, his motion must be denied. *See* Rule 32.2 (b)(1)(A) & (B); *also*, *e.g.*, *Chaim v. United States*, 692 F. Supp. 2d 461, 471 (D.N.J. 2010) ("If the party that has filed the Rule 41(g) motion is itself indicted, it is clear

that any attempts to recover property must then occur in that criminal proceeding."); *United States v. Hills*, No. 1:16CR329, 2018 U.S. Dist. LEXIS 57563, at *28 (N.D. Ohio Apr. 4, 2018) ("[The defendant's] remedy lies in contesting forfeiture at the conclusion of the criminal proceedings."); *United States v. Farhat*, No. 18-CR-292, 2022 U.S. Dist. LEXIS 60240, at *14 (E.D.N.Y. Mar. 31, 2022) ("Courts routinely deny motions pursuant to Rule 41(g) prior to the conclusion of a criminal proceeding.").

### 2. The Seizure Warrant Affidavit Established Probable Cause, Traced the Fraudulent Proceeds to Criminal Offenses, and Demonstrated Why Other Means of Restraint Were Not Sufficient.

Notably, the defendant does not contest the factual allegations in the Affidavit regarding the underlying criminal conduct giving rise to forfeiture. Instead, the defendant takes issue with the purported lack of tracing and the seizure of untainted funds. As explained below, the warrant Affidavit identified all funds seized from the **Target Accounts** (and delineated the portion of the funds that were proceeds vs. commingled "untainted" funds), included detailed tracing of the proceeds to the criminal offenses, and provided a factual basis to demonstrate that other means of restraint may not have been sufficient to preserve the seized funds for forfeiture.

The warrant Affidavit (summarized above) allege the following facts:

The defendant was a sales representative for Apex and Viking from in or around May 2023 through in or around March 2024. Aff. ¶9, 20. The defendant's role was to (i) identify Medicare beneficiaries with wounds of any size and severity; (ii) order and recommend the ordering of allografts to be placed on the wounds; and (iii) refer the beneficiaries to APX, co-owned by Jeffrey King, to receive allografts. Aff. ¶¶10, 20. Gerhke ran Apex and Viking and paid millions of dollars in kickbacks to the defendant and other sales representatives. Aff. ¶9.

Gehrke and King pleaded guilty to conspiracy to commit health care and wire fraud, in violation 18 U.S.C. §1349, for their roles in submitting false and fraudulent claims for allografts that were medically unreasonable and unnecessary, ineligible for reimbursement, and procured through illegal kickbacks. Aff. ¶8.

Gehrke paid over $8.2 million in illegal kickbacks, *i.e.*, criminal proceeds, to the defendant from Apex's JP Morgan Chase ("JPMC") account x9686 ("Apex x9686") and Viking's JPMC account x1090 ("Viking x1090"). Aff. ¶¶65-67. These funds, along with an additional $93,069.60 paid from Apex x9686, were deposited into the defendant's JPMC account x9331, which he opened on or about April 10, 2023, in the name of Karma Medical Consulting LLC ("Karma x9331"). Aff. ¶64. The defendant was the sole signatory on Karma x9331 and no deposits of legitimate funds were made into the account when it was opened. *Id*.

The defendant's Karma x9331 received approximately $7,154,809.17 from Apex x9686 between approximately April 10, 2023, and February 15, 2023, and approximately $1,091,177.00 between approximately February 15, 2024, and March 15, 2024. Aff. ¶¶65-66. Thus, the total amount of criminal proceeds received by the defendant is approximately $8,245,986.17. *Id*. Karma x9331 did not receive deposits from any other source. Aff. ¶67.

Therefore, as explained in the seizure warrant Affidavit, the entire $8,245,986.11 deposited into Karma x9331 constituted traceable criminal proceeds that originated in Gehrke's Apex x9686 and Viking x1090 accounts. *Id*. ¶64-68.

The warrant Affidavit further detailed how the defendant transferred criminal proceeds in Karma x9331 to each of the **Target Accounts**:

i) **Target Account 4 (U.S. Bank x6205)**: Karma x9331 closed on June 12, 2024, with the issuance of a cashier's check in the amount of $931,848.31. Aff. ¶72-73. On the same date, the defendant opened **Target Account 4** in the name of Karma Medical Consulting LLC. Aff. ¶73 The defendant was the sole signatory on the account. *Id.* The initial deposit into the account was the Karma x9331 cashier's check in the amount of $931,848.31, which was a transaction over $10,000 of criminally derived proceeds. *Id.* As noted by Special Agent Ingram, the entire balance from Karma x9331 to Target Account 4 consisted of criminal proceeds from the kickback scheme. Aff. ¶¶67-68, 74. Moreover, through February 28, 2025 (the final statement balance in the government's

possession), **Target Account 4** received "no other deposits" (except for interest), meaning that account was not commingled with any untainted funds. Aff. ¶73. Instead, **Target Account 4** was depleted to $131,280.26, a balance consisting entirely of criminal proceeds. Aff. ¶75. The amount seized from this account with the execution of the warrant was approximately $27,829.17.

ii) **Target Account 5 (Charles Schwab x1792)**: **Target Account 5**, an investment account, was opened on November 2, 2023, with the defendant as the sole signatory. Aff. ¶76. The following day, **Target Account 5** received its first deposit of $277,210.34 in untainted funds that was transferred from an Ameritrade account belonging to the defendant. *Id.* Thereafter, between November 27, 2023, and March 14, 2024, the defendant made twelve transfers of $100,000 each, totaling $1,200,000, into **Target Account 5** from Karma x9331. Aff. ¶77. Each transfer is a transaction involving over $10,000 of criminally derived proceeds. *Id.* **Target Account 5** did not receive deposits from any other source. *Id.* Between the last payment on March 14, 2024, through April 20, 2025 (the last statement balance in the government's possession), the account received no additional deposits. *Id.* Moreover, the account had no withdrawals since its opening. *Id.* Accordingly, as described in the Affidavit, the $1.2 million in deposits that originated from Karma x9331 consisted entirely of criminal proceeds. As further discussed below, the initial $277,210.34 deposit of untainted funds is subject to forfeiture as a matter of law under the applicable money laundering forfeiture provisions. The amount seized from this account with the execution of the seizure warrant was approximately $3,702,644.93.[5]

---

[5] The defendant's assertion that he is entitled to the appreciation of investments of criminal proceeds is unsupported by prevailing legal authority. *See, e.g.*, *United States v. Rudolph*, 152 F.4th 1197, 1239 (10th Cir. 2025); *United States v. Afriyie*, 929 F.3d 63, 73 (2d Cir. 2019); *United States v. Betancourt*, 422 F.3d 240, 251 (5th Cir. 2005); *United States v. Hill*, 46 F. App'x 838, 839 (6th Cir. 2002). *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir. 1998).

iii) **Target Account 6 (Coinbase xb807)**: the defendant was the sole signatory on Wells Fargo bank account x0920 ("WF x0920"), a personal account for daily expenses. Aff. ¶69. As of April 11, 2023, before being funded with any criminal proceeds, WF x0920 had a balance of $963.59. Thereafter, beginning April 12, 2023, WF x0920 routinely received deposits from Karma x9331 by wire, Zelle, and cash transfers, including transactions over $10,000 of criminally derived proceeds. Aff. ¶70. In total, between April 12, 2023, and May 2024, approximately $3,305,000 was transferred from Karma x9331 to WF x0920. *Id.* **Target Account 6** was a Coinbase cryptocurrency wallet the defendant established in 2017, which pre-dated the criminal conduct. Aff. ¶79. As described in the warrant Affidavit, between on or about April 13, 2023, through on or about March 23, 2024, **Target Account 6** received $2,939,775.16 from WF x0920 for the purpose of purchasing cryptocurrency, all of which were criminal proceeds originating in Karma x9331, and most of which were transactions exceeding $10,000 in criminally derived proceeds. Aff. ¶70, 80. Those funds were then converted into the Bitcoin cryptocurrency ("BTC"). Prior to any deposit of criminal proceeds, **Target Account 6** contained an amount of BTC valued at approximately $47,605.11. Aff. ¶80. The Affidavit noted that aside from the deposits described above, **Target Account 6** did not receive deposits from any other source, except for negligible reward payments from Coinbase. Aff. ¶83. As explained below, the $47,605.11 in untainted cryptocurrency that existed in **Target Account 6** prior to the influx of fraudulent proceeds is also subject to forfeiture as a matter of law under the applicable money laundering forfeiture provisions. The amount seized from this account with the execution of the seizure warrant was approximately $2,921,565.93.

As described above, the warrant Affidavit provided a detailed financial analysis identifying the defendant's ownership of the **Target Accounts**, the flow of deposits into

the accounts, the source of those deposits, explanation as to why those deposits constituted forfeitable criminal proceeds, and specified the non-criminal proceeds that were commingled in **Target Account 5** and **Target Account 6**.

### 3. The "Untainted Funds" in Target Accounts 5 and 6 Were Properly Seized as Property "Involved In" Money Laundering.

As noted above and in the warrant Affidavit, **Target Account 5** and **Target Account 6** contained an identifiable amount of commingled funds that were not traceable to criminal proceeds. These funds were appropriately seized pursuant to an "involved in" theory of forfeiture.

The defendant's argument that the untainted funds are shielded from seizure would be true if the government relied solely on a "proceeds" theory; however, the warrant Affidavit alleged probable cause that the **Target Accounts** were subject to both civil and criminal forfeiture as property involved in money laundering in violation of 18 U.S.C. § 1957. Aff. ¶94. Title 18 U.S.C. § 1957 makes it unlawful to "knowingly engage or attempt to engage in a monetary transaction in criminal derived property of a value greater than $10,000 and is derived from specified unlawful activity." Specified unlawful activity includes health care fraud. *See* 18 U.S.C. § 1956(c)(7)(f); 18 U.S.C. § 24.

Section 982 of Title 18 provides the extent to which property can be forfeited upon conviction of 18 U.S.C. § 1957; specifically, "[t]he court, in imposing sentence on a person conviction of [18 U.S.C. § 1957] shall order that the person forfeit to the United States any property, real or personal, *involved in* such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1) (emphasis added). Accordingly, where the defendant violates 18 U.S.C. § 1957, the funds "involved in" the offense(s) are subject to forfeiture, not just proceeds.

When untainted funds are commingled with tainted funds, the untainted funds are deemed "involved in" the offense and therefore subject to forfeiture. *See United States v. Real Property*, Case No. 5:08-cv-303, 2008 WL 11470836, at *6 (M.D. Fla. Dec. 29, 2008) (holding that "under section 1957 the United States is entitled to seek forfeiture of all funds in an account, even if clean funds are involved."); *United States v. Mille*r, 295 F. Supp. 3d

690, 697-698 (E.D. Va. 2018); ("[I]mportantly, property involved in a money laundering offense is forfeitable in its entirety, even if legitimate funds have also been invested in the property.") (citing *United States v. Kivanc*, 714 F.3d 782, 794-85 (4th Cir. 2013) ("[W]hen legitimate funds are commingled with property involved in money laundering . . . the entire property, including the legitimate funds, is subject to forfeiture.")).

Therefore, the determinative issue is whether the "untainted" funds in **Target Account 5** and **Target Account 6** were commingled with tainted funds. If so, the "untainted funds" are forfeitable as "involved in" money laundering.

**Target Account 5** contained $277,210.34 in non-criminal proceeds, which was seized by the government pursuant to the warrant. Despite being untainted money, the $277,210.34 is nevertheless forfeitable as money that was "involved in" the defendant's money laundering because it was commingled with $1.2 million in criminal proceeds. As per the warrant Affidavit, the defendant opened **Target Account 5** on November 2, 2023. The defendant's first deposit into the account was the $277,210.34 in "untainted" funds at issue, which he transferred from an Ameritrade investment account in his name into **Target Account 5** the day after he opened **Target Account 5**. Aff. ¶76. Within a matter of weeks, the defendant began regularly depositing criminal proceeds into the account in amounts of $100,000 per deposit. Aff. ¶77. In less than five months, the defendant deposited $1,200,000 in criminal proceeds into **Target Account 5**. *Id.*

As for **Target Account 6**, the $47,605.11 in BTC that existed in the account before the influx of millions of dollars in criminal proceeds is also forfeitable as money "involved in" the defendant's money laundering, as it was also commingled with criminal proceeds. As noted in the warrant Affidavit, in approximately 11 months between April 2023 and March 2024, the defendant purchased almost $3 million in BTC, which was held with the "untainted funds" in **Target Account 6**, his Coinbase cryptocurrency wallet.

Various courts have upheld seizures of untainted funds when they are commingled with criminal proceeds in violation of 18 U.S.C. § 1957.

For example, in *United States v. Real Property*, 2008 WL 11470836 (M.D. Fla. Dec. 29, 2008), the government seized two bank accounts that the government alleged were involved in a money laundering scheme in violation of 18 U.S.C. §§ 1956 and 1957. *Id.* at *1. Thereafter, the government filed a civil forfeiture complaint, asserting the seized funds were subject to forfeiture. *Id.* The claimant contended the government lacked probable cause to seize *all* the funds in the bank accounts because they were commingled with untainted funds. *Id.* at *6. In upholding the seizures of both tainted and untainted funds, the court held that even assuming the seized accounts did in fact contained untainted funds commingled with the criminal proceeds, "the accounts – as well as any commingled funds – would be subject to forfeiture." *Id*. The court explained that "under section 1957, the United States is entitled to seek forfeiture of all funds in an account, even if clean funds are involved." *Id.* at *7.

Similarly, in *United States v. One 1987 Mercedes Benz 300E*, 820 F. Supp. 248 (E.D. Va. 1993), the court held that a vehicle that was paid for with both tainted and untainted funds was subject to forfeiture in its entirety pursuant to the forfeiture provisions applicable to 18 U.S.C. §§ 1956 and 1957. *Id.* at 252-53. The vehicle at issue was purchased with $9,000 of untainted funds and $12,901 of criminal proceeds. *Id.* at 250. The claimant argued he was entitled to the return of the $9,000 down payment because it originated from legitimate sources. *Id.* The District Court disagreed, declaring that "[t]he simple lesson of the statutes and the decisions construing them is that wrongdoers cannot shield from forfeiture any legitimate funds commingled with tainted funds." *Id*. at 253. Applying this principle to the defendant's vehicle, the court found that "[b]y using the Mercedes purchase as a means of laundering the [criminal] proceeds . . . [the defendant] subjected to forfeiture any legitimate funds also involved in the purchase transaction." *Id*.

And in *United States v. Miller*, 295 F. Supp. 3d 690 (E.D. Va. 2018), the court ordered the forfeiture of a home wholly purchased with untainted funds but improved with criminal proceeds based on a Section 1957 money laundering "involved in" theory. *Id*. at 697-98. The defendants were charged with creating fake law firms, causing the transfer of

purported legal fees, and laundering the money through multiple accounts and bogus entities. *Id*. at 692. A portion of those laundered proceeds were used to fund improvements and make payments (exceeding $10,000) to two properties that were purchased by the defendants six years before the charged conspiracy began. *Id*. at 692-94. In finding the two properties forfeitable as "involved in" the 1957 money laundering offense, the court highlighted a $22,500 transfer of fraud proceeds to a bath and tile company for improvements to one of the properties, and a $23,000 transfer of fraud proceeds to the holder of a $600,000 note secured by the second property and used for its purchase. *Id*. at 693, 699. (Notably, there was no dispute that the $600,000 note constituted untainted funds.) The court held that "property in a money laundering offense is forfeitable in its entirety, even if legitimate funds have also been invested in the property." *Id.* at 697-98 (citing *Kivanc*, 714 F.3d at 794-95).

In each of these three cases, the courts deemed bank accounts, personal property, and real estate to be forfeitable as "involved in" 1957 money laundering, even though the seizures involved untainted funds that were commingled with criminal proceeds. The result comports with the differing categories of forfeitable assets under Section 982(a)(1) and 982(a)(2). Section 981(a)(2) clearly limits forfeiture for certain offenses to criminal proceeds; by contrast, forfeiture for money laundering offenses under Section 982(a)(1), including 18 U.S.C. § 1957, authorizes forfeiture of a broader category of assets, including those "involved in" the money laundering offenses. In order to give meaning to the broader category subject to forfeiture that Congress intended, comingled funds containing a mixture of both criminal proceeds and untainted funds must be subject to forfeiture; otherwise, there would be no difference between the assets subject to forfeiture under 982(a)(1) and those under 982(a)(2). Defendant's argument that only tainted funds are forfeitable ignores this distinction that Congress created.

Accordingly, under the cases and statutory authorities, **Target Account 5** and **Target Account 6** are subject to forfeiture in their entirety, including the untainted funds pre-dating the offenses.

- 17 -

The defendant's citation to the Third Circuit's decision in *United States v. Voigt,* 89 F.3d 1050 (1996), is readily distinguishable. At issue in *Voigt* was whether the trial court erred in issuing a forfeiture order that required the defendant to hand jewelry over to the government as property "traceable to" fraud proceeds when the jewelry was purchased with funds from an account in which money laundering proceeds had been commingled with other untainted funds. *Id*. at 1084. The issue was largely academic: there was no dispute as to whether the jewelry was forfeitable; rather, the issue was whether it was forfeitable under a "traceable to" theory (as ordered by the trial court) or separately forfeitable as a substitute asset. *Id*. at 1088. The Court held that the extent of the commingling prevented the purchase funds to traced without difficulty, thereby requiring the government to satisfy its forfeiture judgment through the substitute asset provision. *Id*. The court remedied the trial court's error by simply ordering amendment of the judgment. *Id*.

But even if *Voigt* involved the pre-conviction seizure of the jewelry, the problems encountered with dividing the commingled criminal proceeds from legitimate funds in that case are not present here—the warrant Affidavit at issue cleanly traces and delineates the fraud proceeds and deposits from other untainted sources.

For reasons outlined above, the government has made the requisite probable cause showing that the seizure of untainted funds from **Target Account 5** and **Target Account 6** was proper, as those funds were "involved in" the defendant's money laundering.

### 4.  The Warrant Affidavit Satisfied 21 U.S.C. § 853(f)'s Requirements for Seizing the Defendant's Property.

21 U.S.C. § 853 prescribes the procedures by which the government may seize or restrain property that may be subject to forfeiture. There are two mechanisms available for this purpose: a protective order (or "restraining order") pursuant to Section 853(e); or a seizure warrant pursuant to Section 853(f). *See* 21 U.S.C. §§ 853(e), (f). Section 853(f) allows for pre-trial seizure of assets based on a finding that: (1) there is "probable cause to believe that the property to be seized would, in the event of a conviction, be subject to forfeiture," and (2) a restraining order under Section 853(e) "may not be sufficient to assure the availability of the property for forfeiture." *Id.*

The defendant argues that the warrants should be vacated because the government did not make a "particularized demonstration that a restraining order would have been sufficient." [ECF No. 54 at 9].

Preliminarily, when a judge or magistrate issues a seizure warrant, it is presumed that he or she made the required probable cause findings; thus, it is not necessary that the warrant contain an explicit finding that a restraining order would be inadequate to preserve the property for forfeiture. As the district court succinctly stated in *United States v. Dupree*, 781 F. Supp. 2d 115, 132 (E.D.N.Y. 2011), "[t]here is no requirement under § 853(f) in particular, or in any seizure warrant in general, and the court has located no case to the contrary, that the Judicial Officer issuing the seizure warrants is required explicitly to state that a restraint under § 853(e) may not have sufficiently assured the availability of funds."

Here, the warrant Affidavit described a sophisticated, complex scheme by the defendant and his co-conspirators to defraud Medicare of hundreds of millions of dollars and alleged that the defendant and co-defendant Tyler Kontos opened bank accounts in the name of limited liability companies ("Wild West Medical Consultant LLC" and "Karma Medical Consulting LLC") to conceal and launder the fraudulent proceeds. Aff. ¶¶8-85. The accounts seized by the government contained fungible assets easily transferred in and out of the accounts.

The Affidavit further alleges that there was a "substantial risk that the **TARGET ASSETS** [would] be withdrawn, moved, dissipated, or otherwise become unavailable for forfeiture unless immediate steps are taken to secure them at the time the requested seizures are executed." Aff. ¶90. Special Agent Ingram noted that, based on his training and experience:

> restraining orders served on banks sometimes fail to preserve the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of setoff to satisfy an outstanding debt owed to the bank by the account holder. In contrast, where electronic funds are concerned, a seizure warrant guarantees that the funds will be in the Government's custody once the warrant is served.

Aff. ¶91.

These representations align with the recognition by various Federal courts that restraining orders are often inadequate due to the inherent fungibility and transferability of money in a bank account. *See*, *e.g.*, *United States v. Lewis*, 2006 WL 1579855, *5 (D. Minn. June 1, 2006) (vehicles and funds in bank accounts may be seized pursuant to Section 853(f) because both can easily be moved or transferred; thus, a restraining order would be inadequate); *United States v. Wiese*, 2012 WL 43369, *2 (E.D. Mich. Jan. 9, 2012) (a Section 853(f) warrant may be used to seize funds in a bank account because they may be easily moved); *United States v. Martin*, 460 F.Supp. 2d 669, 677 (D. Md. 2006) (finding probable cause to believe that a restraining order would not have been adequate to maintain fungible, transferable property such as cash or money seized from a bank account), *aff'd*, 662 F.3d. 301, 304 n.6 (4th Cir. 2011).

In addition to Agent Ingram's representation as to the inadequacy of protective orders based on his training and experience, the warrant Affidavit included allegations that the defendant had in fact dissipated forfeitable criminal proceeds. Specifically, the Affidavit indicated that **Target Account 4** had opening deposit of $931,848.31 on June 12, 2024, which consisted wholly of criminal proceeds. Aff. ¶73-74. **Target Account 4** received no other deposits from any other source except for interest from the bank. Aff. ¶73. As of February 28, 2025—the most recent account statement in the possession of the government—**Target Account 4**'s balance had dwindled down to $131,280.26. Aff. ¶ 75. This means that in a matter of eight months, the account was depleted by $800,586.05, an average of over $100,000 in withdrawals per month during that time period. The depletion of criminal proceeds has been viewed as evidence in support of a warrant under 853(f). *See Dupree*, 781 F. Supp. 2d at 133 (the government may satisfy 853(f) by showing depletion of proceeds in a bank account).

Moreover, **Target Account 5** is a Schwab investment account and **Target Account 6** is a Coinbase cryptocurrency wallet, both of which held millions of dollars of criminal proceeds that could be easily liquidated or transferred. *Id.* ¶76-81. Based on the nature of these assets, it was reasonable for Magistrate Judge Willett to conclude that, had the seizure

1    warrants not been issued in the instant case, the substantial funds in **Target Account 5** and

2    **Target Account 6** that were subject to forfeiture might not have been preserved for trial.

3        Between the nature of the offenses as alleged in the warrant Affidavit, the affiant's

4    knowledge based on his training and experience, the defendant's dissipation of **Target**

5    **Account 4**, and the inherent transferability and fungibility of the assets, Magistrate Judge

6    Willett had sufficient facts establishing probable cause that a restraining order may have

7    been insufficient to assure the availability of property for forfeiture.

8        The cases cited by the defendant on this point are unavailing. In *United States v.*

9    *Walker*, the district court voided a series of seizure warrants (and replaced them with

10    protective orders) based on evidence that an allegation in the affidavit relied upon by the

11    court when issuing the warrants—specifically, the allegation that the defendants told a

12    confidential informant they were considering selling their cars, emptying their bank

13    accounts, and fleeing the country to avoid prosecution—turned out to be unfounded. 943

14    F. Supp. 1326, 1330-31 (D. Colo. 1996). The sparce facts laid out in the opinion suggest

15    that this misrepresentation was the only allegation presented to the court concerning the

16    potential dissipation of property.

17        In the instant case, however, there is no evidence nor suggestion that any of the

18    allegations in the warrant Affidavit were misrepresented or otherwise inaccurate.

19    Accordingly, Magistrate Judge Willett issued the seizure warrants after being accurately

20    apprised of the relevant facts concerning the nature of the criminal conduct, the type and

21    value of the assets at issue, and the affiant's training and experience with such issues.

22    Because none of the issues present in *Walker* exist here, Magistrate Judge Willett's

23    determination should be afforded the appropriate deference.

24        The defendant also cites to *In re 2000 White Mercedes ML 320 Five-Door SUV*, 220

25    F. Supp. 2d 1322 (M.D. Fla. 2001), in support of his proposition that the government "must

26    present concrete reasons" why notifying the defendant and freezing assets would "likely

27    result in the assets' loss or destruction." [ECF No. 54 at 9]. In *White Mercedes*, the

28    government sought seizure warrants under 853(f) for money and other personal property

assertedly connected with drug trafficking. *Id*. at 1323. However, the property at issue had already been seized by the government pursuant to civil seizure warrants. *Id*. The court declined to issue the government's 853(f) warrants, finding that because the property was already in government custody, a restraining order issued under § 853(e) would be adequate to preserve it. *Id*. at 1325-26.

*White Mercedes* is readily distinguishable, as the property seized from the defendant in this case was not in the government's custody at the time the seizure warrants were sought, signed, or executed. Thus, the basis for the court's denial of the seizure warrants in *Willett* are not present or applicable here.

Because sufficient and reliable facts were presented to Magistrate Judge Willett in support of a finding that a restraining order was insufficient to assure the availability of the property, Magistrate Judge Willett's determination that a factual basis existed to issue the warrants should not be disturbed.

**5. The Defendant has no Fifth Amendment Right to Pre-Seizure Notice or Hearing.**

The defendant was not entitled to advance notice of the government's intent to seize the target accounts, nor did he have a Fifth Amendment right to a pre-seizure hearing. The text of 853(f) (and 853(e)) makes clear that pre-seizure notice to a property holder is not required if such notice would jeopardize the availability of the property for forfeiture. 21 U.S.C. §§ 853(e)(2), 853(f). The defendant seems to acknowledges as much in his filings. *See* ECF No. 54 at 12 ("courts have permitted *ex parte* seizures at the outset, recognizing that advance notice could enable a person to hide or spend the assets.").

Despite this recognition, the defendant nevertheless argues that he was entitled to advance notice of the government's intent to seize his accounts and relies on *United States v. James Daniel Good Real Prop.* 510 U.S. 43 (1993) in support. In *James Daniel Good*, the Court held that *ex parte* seizures of real property required prior notice and a hearing. *Id*. at 59. The inability to move or conceal real property was critical to the Court's analysis, as its immovability was distinguishable from yachts, which could be seized without prior notice or a hearing pursuant to *Calero-Toledo v. Pearson Yacht Leasing Co*., 416 U.S. 663

(1983). The difference was that a yacht could be "removed to another jurisdiction, destroyed, or concealed if advance notice of confiscation were given," *id*. at 679, whereas a residence could not.

The Court's concern in *James Daniel Good*—that pre-seizure notice could cause the pretrial disappearance of movable property—is significantly greater here, as the property at issue—bank account balances and cryptocurrency—can be transferred and dissipated from a cellular phone.

Accordingly, because there is no legal requirement to provide pre-seizure notice to the owner of personal property, the defendant's requested relief should be denied on that basis.

### 6. The Defendant Has No Sixth Amendment Right to a Post-Seizure, Pre-Trial Hearing on the Merits Absent a Showing of True Financial Need and a Bona Fide Challenge to the Probable Cause Finding.

The defendant asserts that he is entitled to an immediate hearing to contest the seizures, as the seizures have prevented him from paying his attorney of choice and his family's living expenses. [ECF No. 54 at 13]. This request should be denied as there is no basis under the Sixth Amendment to pay household expenses, and the defendant has not made the requisite threshold showing of financial need to warrant a hearing to determine whether seized assets should be released for payment to counsel.

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend VI. One element of this basic guarantee is the right to counsel of choice. *Powell v. Alabama*, 287 U.S. 45, 53 (1932). But this is right is not absolute: criminal defendants have no Sixth Amendment right to use tainted property to hire attorneys. *See Caplin v. United States*, 491 U.S. 617, 623–35 (1989); *United States v. Monsanto*, 491 U.S. 600, 614, 616 (1989) (pre-trial asset restraints based on probable cause are constitutionally permissible, even when a defendant seeks to use those restrained assets to pay for counsel).

But since *Monsanto*, trial courts have afforded defendants an opportunity to challenge probable cause concerning a property's nexus to the crime where a defendant

seeks to lift an asset restraint to pay for a lawyer. *See Kaley v. United States*, 571 U.S. 320 at 324 (2014).

The Ninth Circuit standard for granting a pre-trial probable cause hearing to determine whether the seized funds have a sufficient nexus to the crime is set forth in *United States v. Unimex, Inc.*, 991 F.2d 546-47 (9th Cir. 1993). Recognizing that "a defendant has no right to use the government's money to retain counsel of its choice, and forfeitable money belongs to the government," *id.* at 549, the Court held that a defendant is entitled to a post-seizure hearing challenging probable cause only if he makes a "substantial claim" supported by specific, detailed and nonconjectural allegations:

> To determine whether a hearing is required, the court must decide whether the moving papers filed, including affidavits, are "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented. If the allegations are sufficient, and factual issues are raised, a hearing is required.

*Id.* (quoting *Cohen v. United States,* 378 F.2d 751, 761 (9th Cir.)). *See also U.S. v. Cobb*, 2015 WL 518548, at *5 (D. Nev. Feb. 9, 2015) (stating that "[e]ven if defendants were entitled to some funds for their legal fees, they failed to make the required threshold showing of what specific, definite funds are needed to pay for their counsel...[and] have also failed to provide any evidence showing they do not have access to unrestrained funds").

Such a showing requires "more than a 'mere recitation.'" *United States v. Gillum*, 2025 U.S. Dist. LEXIS 209252, at * 7 (E.D. Cal Oct. 23, 2025) (citing *United States v. Bonventre*, 720 F.3d 126, 131). This District Court has denied a motion for a hearing when the defendants failed to attach supporting declarations showing financial need. *United States v. Lacey*, No. CR-18-00422-001-PHX-DJH, 2021 WL 5882638, at *9 (D. Ariz. Dec. 10, 2021) (denying motion for a hearing where defendants did "not attach any declarations . . . explaining how much they need to pay counsel or prepare for trial, what their trial budget might be, what expenses they intend to pay from any released funds, what would become of any unspent or excess funds not ultimately paid to counsel, or even swearing that they will actually use any funds released to pay counsel").

Here, the defendant has not provided any supporting declarations demonstrating financial need, nor provide the requisite specificity in his filing to support his claim. Other than the unsupported representation that he lacks sufficient funds, he has not put forth any evidence that he is financially unable to retain counsel without the seized funds, and the available information suggests that he cannot produce such evidence: the government is in the possession of financial records indicating that the defendant had over $1 million in Charles Schwab investment account x6421 as of August 2025; over $66,000 in Charles Schwab investment account x9639 as of April 2025; over $89,000 in a Desert Financial Credit Union checking account x7226 as of March 2025; and over $66,000 in a U.S. Bank account x6197 as of September 2025. In total, the government is aware of at least $1.2 million that should be available to the defendant to pay counsel.

Because the instant motion clearly fails the test in *Unimex* and its progeny, the defendant is not entitled to a post-seizure hearing to determine whether seized funds should be released for retention of counsel.

**7.  The Defendant's Eighth Amendment Challenge is Premature.**

Finally, the defendant suggests that the seizure warrants should be voided or modified because the seized funds, if forfeited, would be an excessive fine in violation of the Eighth Amendment.

Where there is a challenge to the excessiveness of a forfeiture, it is "well-established that a challenge to a forfeiture on Eighth Amendment grounds cannot be made until after the precise amount of the property forfeited and the evidence of the underlying offense are in the record and can properly be compared." *United States v. $109,086.00*, No. CIV.A. H-04-3727, 2005 WL 1923613, at *4 n.1 (S.D. Tex. Aug. 10, 2005) (internal citations omitted); *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 208 (D.D.C. 2014) (denying motion to dismiss in part because "it would be premature to adjudicate the claimants' excessive fines argument before entering a forfeiture order").

Accordingly, courts routinely deny Eighth Amendment claims concerning the disproportionality of the forfeiture before sentencing. *United States v. Razo-Quiroz*, No.

1:19-cr-00015-DAD-BAM, 2019 WL 1517571 (E.D. Cal. Apr. 8, 2019) (motion to dismiss forfeiture allegation on Eighth Amendment grounds based on argument that forfeiture would be grossly disproportional to offense was denied as premature because defendant had not yet been convicted of any offense on which forfeiture could be based, with leave to renew should matter become ripe in the future); *United States v. Montour*, No. CR09–0214 MJP, 2010 WL 1417797, *2 (W.D. Wash. Apr. 6, 2010) (court cannot engage in a proportionality analysis until the underlying facts are established at trial; thus a motion to dismiss the forfeiture notice on Eighth Amendment grounds is premature); *United States v. Tedder*, No. 02–CR–0105–C–01, 2003 WL 23204849, *6 (W.D. Wis. July 28, 2003) (challenges to a criminal forfeiture on Eighth Amendment grounds are premature until court enters a preliminary order of forfeiture).

But even if the defendant were entitled to a hearing, he could not establish that the $6.6 million seized is "grossly disproportional" to the gravity of the defendant's offense. *United States v. Levesque*, 546 F.3d 78, 83 (1st Cir. 2008). The factors to be considered when assessing gross disproportionality are: (1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant. *United States v. Heldeman*, 402 F.3d 220, 223 (1st Cir. 2005).

In this case, the defendant falls within the class of persons at whom the criminal statute was directed; the defendant caused historic financial harm to taxpayer-funded health care programs (over $600 million in actual loss); and the other penalties authorized by the Sentencing Commission and by statute greatly exceed the amount seized—the indictment alleges that the defendant received over $8 million in illegal kickbacks during his participation in the conspiracy. Thus, the amount of his dishonest gains *alone* exceed the total amount seized by over $1 million. Moreover, if convicted, the court is authorized to impose a fine up to twice the amount of the defendant's financial gain from the crime ($16 million) or twice the amount of the victim's loss ($1.2 billion). 18 U.S.C. § 3571(d).

1

## IV.    CONCLUSION

2        As noted above, the warrant Affidavit establishes that there was probable cause to

3   issue the warrants, the seized funds were adequately traced and specifically identified, a

4   protective order under 853(e) may not have assured the assets' availability for trial, and the

5   funds seized from the defendant's accounts did not exceed the Defendant's personal gain

6   from any alleged wrongdoing, potential fines, or guidelines-level forfeiture. Additionally,

7   the warrant Affidavit set forth probable cause to seize any "untainted" funds commingled

8   with the fraud proceeds, as those funds were "involved in" transactional money laundering,

9   and the defendant is not entitled to pre-seizure notice or a hearing to contest the seizures.

10       Accordingly, the defendant's motion should be denied in its entirety.

11

12                                        TIMOTHY COURCHAINE
                                          United States Attorney
13                                        District of Arizona

14                                        MATTHEW WILLIAMS
15                                        Assistant U.S. Attorney

16

17                                        LORINDA LARYEA
                                          Acting Chief, Fraud Section
18                                        United States Department of Justice

19

20                        By:    */s/ Shane Butland*
21                                        SHANE BUTLAND
                                          Trial Attorney
22                                        Department of Justice, Fraud Section

23

24

25

26

27

28

- 27 -

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on the 15th day of January, 2025, I electronically transmitted

3

the attached document to the Clerk's Office using the CM/ECF System for filing a copy to

4

the following CM/ECF registrants:

5

6

Ronald Chapman III, Esq.

7

Susan E. Anderson, Esq.

Ian Bucon, Esq.

8

Quacy Lamar Smith, Esq.

9

10

*/s/ Shane Butland*

SHANE BUTLAND

11

Trial Attorney

Fraud Section, Criminal Division

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28